UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>JERAMY JAMES FRERIKS (D-1),<br><br>　　　　　　　　　Defendant. | CASE NO. 3:10-CR-0106-TMB-DMS<br><br>**FINAL REPORT AND RECOMMENDATION[1] REGARDING DEFENDANT'S MOTION TO SUPPRESS UNDULY SUGGESTIVE IDENTIFICATION EVIDENCE [DOC. 24]** |

## I. BACKGROUND

Defendant Jeramy Freriks (hereafter Freriks) is charged with four counts of forgery of securities in violation of 18 U.S.C. § 513(a), one count of unlawful possession of five or more documents or authentication features in violation of 18 U.S.C. § 1028(a)(3), (b)(1)(A), and (b)(1)(B), one count of aggravated identify theft in violation of 18 U.S.C. § 1028A(a)(1), and one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). His co-defendant in this case, Rodney Lee Drake, is charged with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

---

[1] This report and recommendation is being issued as a final report and recommendation. Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

1

## II. MOTION PRESENTED

Freriks filed this motion at Docket 24 requesting that the Court preclude the admission of in-court and out-of-court identification evidence. He argues that law enforcement's identification procedures in this case failed to comply with due process requirements because the procedure was unduly suggestive, giving rise to a substantial likelihood of misidentification, and the resulting eyewitness identification was not reliable.

The Government opposes the motion. It asserts that the procedure law enforcement used to obtain an eye-witness identification of Freriks was not unduly suggestive and, even if this Court were to consider the procedure suggestive, the witnesses' identification of Freriks was nonetheless reliable.

An evidentiary hearing was held on February 8, 2011. At the hearing, Postal Inspector Matt Hoffman testified regarding the eye-witness identification procedure used in this case and the facts surrounding the witnesses' identification of Freriks. The transcript for the evidentiary hearing is located at Docket 34.

## III. FACTS

### A. Incident on January 15, 2008

On January 15, 2008 a housekeeper at America's Best Suites, located on Spenard Road in Anchorage, Alaska, found a nine millimeter semi-automatic handgun underneath a pillow in room number 105. (Tr. at 8, 10). The room had been registered the prior night to Rodney Drake. (Tr. at 9). The person working at the front desk, Gengly Cortez, observed two men as they were checking out of room 105. (Tr. at 60). At the time the housekeeper found the gun, the two men had already checked out of the room and therefore when Mrs. Cortez observed the men check

out, she was unaware of the gun or of any other unusual circumstance. (Tr. at 9, 63).

The housekeeper, Esther Rastopsoff, brought the gun to the front desk. Ms. Rastopsoff and Ms. Cortez called the police about the gun. They were frightened and concerned that the men might come back for it. (Tr. at 10). An Anchorage Police Department (APD) officer responded to the call at about 1:00 p.m. The officer took possession of the firearm, and left the hotel. (Tr. at 9, 61). Shortly thereafter, one of the men from room 105, the younger of the two, came back to the front desk of the hotel to inquire about the gun. (Tr. at 10, 21, 64). Both Ms. Rastopsoff and Ms. Cortez were at the front desk and observed the man. (Tr. at 22, 64, 66). He asked if he could go back into the room because he had left his gun or something in there and did not want the police to come. (Tr. at 65-66). Ms. Cortez reported that she told the man that the housekeeper had already cleaned the room and declined to give him a key to get back in, so the man left. (Tr. at 64-65).

Shortly after the APD officer had left the hotel and about the time the young man returned, the APD officer checked the name Rodney Drake and discovered that he had outstanding felony warrants. (Tr. at 61). The officer talked to the women at the hotel again and asked that they contact the APD if anyone came back for the gun. The women told the officer that someone had just come back for it and that he was just then leaving the hotel parking lot in a red SUV turning eastbound on Spenard Road. (Tr. at 11).

The APD began looking for the red SUV. An officer spotted the vehicle and at that point the vehicle began to elude him. (Tr. at 11-12). The officer was not able to stay with the red SUV, but it was eventually spotted again around International and Spenard Roads. The vehicle stopped at the Millennium Hotel in Anchorage and the occupants attempted to flee on foot. (Tr.

3

at 12). Officers apprehended the two men who ran from the vehicle. They first caught the passenger, Rodney Drake. (Tr. at 12). The driver, Freriks, was caught in the basement of a nearby home that he had broken into as he fled from the police. (Tr. at 13).

Pursuant to the arrest of Freriks and Drake, the APD officers obtained evidence that is the basis for the charges in this case. Specifically, on Freriks, the officers found counterfeit Alaska driver's licenses bearing Freriks's picture but having different names on each one. (Tr. at 13). They also found a number of personal checks in the names of other people, some of which were linked to the licenses found. (Tr. at 13). After obtaining a search warrant for the red SUV, the officers found a backpack that contained stolen mail and additional counterfeit identification cards. (Tr. at 13-14). They also found a brown bag that contained the personal effects of Mr. Drake and a holster for a revolver, a package of ammunition, and 53 grams of cocaine. (Tr. at 14). The revolver that fit in the holster was found in the glove compartment. (Tr. at 14).

**B. First Identification Effort**

Because the identity theft and mail theft issues were related to the United States mail service, Postal Inspector Matt Hoffman was assigned to the case. He became involved in late February or early March of 2008. (Tr. at 8). Based on his review of the APD reports, he realized that no officer or investigator had interviewed the two women from the hotel who were working on January 15, 2008. Inspector Hoffman wanted to see if the women could identify the two men apprehended in the chase as the individuals associated with room 105 on January 15, 2008.

He requested that the Alaska Department of Public Safety prepare photo lineups of both Freriks (Gov. Ex. 2) and Drake (Def. Ex. A). First, he met with the prior owner of the red SUV to find out if the prior owner could identify either Freriks or Drake as the person who bought the

4

vehicle. After reviewing the photo line ups, both the prior owner and another eye witness identified Freriks as the man who bought the red SUV.

The Department of Public Safety prepares the photo lineup based upon driver's license photos on record. In the case of Freriks, the picture included in his lineup was his license photograph taken on September 10, 2007, about four months prior to the January incident. (Tr. at 18, 24; Gov. Ex. 1). In the lineup that included Freriks, there are two rows of three driver's license photographs. All the men shown resemble one another in that they are all white males who appear to be about the same age and weight with short brown hair and dark eyebrows. Freriks is located in the second row, in position number 5. The back of the photo lineup has an advisement, which states as follows:

> The photographic lineup you are about to view is made up of photos selected by similarity of physical characteristics. The people in the photographs are not necessarily suspects, nor are they necessarily under investigation for the commission of a crime, nor do they necessarily have criminal backgrounds.

(Gov. Ex. 2). Inspector Hoffman planned to use that lineup during his interview of the two women.

He went to the hotel on April 14, 2008, about three months after the incident. Both women were at the hotel. (Tr. at 41). Inspector Hoffman believes that his interview with the women on April 14, 2008 was the first time any law enforcement officer had interviewed them about the events of January 15, 2008. The witnesses said that Inspector Hoffman was the first person who had talked to them about it. (Tr. at 40-41). He testified that he did not know if the women knew someone had been arrested based on the events of January 15, 2008. He did not recall saying anything to the women about the investigation except that he wanted to talk to them

5

about it.

He interviewed them separately, so that the statements of one woman would not taint the memory of the other. (Tr. at 19). He interviewed the front desk employee, Ms. Cortez, first. She described the events of that day and then provided Inspector Hoffman a verbal description of the two men involved. (Tr. at 20). She described the second man—the one who came back to the hotel to retrieve the gun—as a white male, about 28 years old, six-feet tall, skinny, with short cropped hair and an unshaven appearance. She noted that he had a bruised eye. (Tr. at 21). She described the other man, whom she had seen only at the time the men checked out, as a white male, about 37 years old, short, and chubby. (Tr. at 21). He then began the process of showing Ms. Cortez the photo lineups. He read the advisement from the back of the lineup sheet, which stressed that people in the photographs are not necessarily suspects or criminals. (Tr. at 25, 42, 44). He then had Ms. Cortez sign the advisement, acknowledging she understood that the photographs should not reflect on the reputation of character of the people. (Gov. Ex. 2; Tr. at 44). He showed Ms. Cortez the lineups for the two men. Inspector Hoffman recalled that she looked at the lineups thoroughly. (Tr. at 51). She was not able to identify Freriks or Drake from the lineups. (Tr. at 26). Indeed, she did not indicate that she had any level of familiarity with anybody in the lineup and did not identify anybody as being involved with the incident on January 15, 2008. (Tr. at 46).

Inspector Hoffman then went through the same process with Ms. Rastopsoff. He had her verbally described the man who came back to the hotel to reclaim the item left. She described him as a white male, about 5'10" and 160 pounds, with light brown hair that she said was "in his face." She also noted that the man had a healing black eye. (Tr. at 22). She did not provide a

6

description of the second man because she, unlike Ms. Cortez, did not see him at the time of checkout. (Tr. at 22). He then read the advisement to her about the lineup and had her sign it. She did not identify Freriks from the lineup. (Tr. at 26). She did not indicate that she had any level of familiarity with anybody in the lineup and did not identify anybody in that lineup as being involved with the incident on January 15, 2008 (Tr. at 48). Inspector Hoffman testified that he did not identify any suspects to the women before or after showing them the lineups. (Tr. at 75).

**C. Second Identification Effort**

Inspector Hoffman thought that it was unusual the witnesses could not identify the people arrested in the red SUV from the lineups. He decided to find a more recent photograph of Freriks, one that he thought would more closely resemble Freriks as he looked on January 15, 2008. He obtained the booking photograph taken from Freriks. That photograph was taken on the same day as the hotel incident.

The booking photograph, however, presented problems for Inspector Hoffman in terms of preparing another photographic lineup because the booking photo was not in digital form. The jail could not locate a digital booking photo for Freriks in the system. Instead, a record person within the jail system could only locate an actual paper copy of Freriks's booking photo. That photo was only one inch by one inch in size and when Inspector Hoffman enlarged it, it became grainy and pixilated. Inspector Hoffman decided against preparing another photographic lineup. He was concerned that the lesser quality of Freriks's booking photo would cause it to stand out in comparison with other booking photos or license photos, which would be digital. (Tr. at 34). He decided to simply present the picture singly to the witnesses. (Tr. at 34).

7

Inspector Hoffman enlarged the one-by-one photograph to about a five-by-seven inch photograph. (Tr. at 28, 30, 50;Gov. Ex. 4). He also cropped the photograph so that the yellow jumpsuit typically worn by inmates would not be visible. (Tr. at 28-30). Based on this Court's review of the photograph, there are no indications that the photograph, as prepared by Inspector Hoffman, was taken upon arrest or booking or that the person in the photograph was a suspect in custody. (Gov. Ex. 4). There are a few distinct differences between the driver's license photo and the booking photo. In the booking photo, Freriks's hair appears to be shorter, his facial hair appears to be thicker, and he has a remnant of a black eye. (Gov. Ex. 1; Gov. Ex. 4).

Inspector Hoffman went back to the hotel on April 18, 2008 with the more recent photograph of Freriks. He again showed the women the photograph separately. When showing the photograph to both women, he first read them an advisement similar to the one he read with the lineup, but he edited the advisement to fit the single photograph scenario. (Tr. at 35). He could not exactly recall how he altered the advisement and we do not have a recording of the contact because the formal policy of the U.S. Postal Inspector Agency in Anchorage is not to record contacts. Inspector Hoffman testified that he likely said something about how the person in the photograph is not necessarily a suspect, nor is he necessarily under investigation for the commission of a crime, nor does he necessarily have a criminal background. (Tr. at 58-59, 71).

Ms. Cortez was shown the photograph first. Inspector Hoffman testified that she immediately recognized the person in the photograph as the person who came back to the hotel on January 15, 2008 to inquire about the gun in room 105. (Tr. at 35, 56). He asked her how confident she was of her identification and she indicated that she was 100 percent confident. (Tr. at 36, 57-58). He had Ms. Cortez indicate her identification on the photograph and sign and date

8

the photograph. She wrote on the bottom right corner of the photograph, "I'm 100% sure this is the guy who asked about the gun." (Gov. Ex. 4).

He then followed the same procedure with Ms. Rastopsoff. He made a similar advisement and then showed her the photograph. He made certain to cover up the bottom right corner of the photograph so that Ms. Rastopsoff could not see what Ms. Cortez had written on the photograph. (Tr. at 36, 58). Inspector Hoffman testified that Ms. Rastopsoff immediately recognized the person in the photograph as the person who had come to the hotel to inquire about something he left in room 105. She indicated that she was 80 percent confident in her identification. She wrote on the bottom left corner of the photograph, "80% sure this man asked for 'something' he left in room 105." (Gov. Ex. 4).

Inspector Hoffman testified that he did not conduct other questioning of the two witnesses that day. His contact was limited to the issue of the additional photograph. (Tr. at 73). He testified that even after the women indicated they recognized the person in the photograph, he did not give them any affirmation that the person in the photo was indeed the suspect or that he had been arrested. (Tr. at 75).

## IV. DISCUSSION

In this motion, Freriks challenges the pretrial procedure used to obtain eyewitness identifications of him. He argues that the procedures were suggestive, and therefore due process requires that evidence of the witnesses' pretrial identifications of him and any subsequent witness identifications of him during trial be suppressed. Indeed, "[s]uggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." United States v. Bagley, 772 F.2d 482, 492 (9th

9

Case 3:10-cr-00106-TMB   Document 57   Filed 04/05/11   Page 9 of 17

Cir. 1985). The concern with suggestive pretrial identifications is that they increase the likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 198 (1972). But a suggestive pretrial identification procedure does not per se intrude upon a constitutionally protected interest. Manson v. Brathwaite, 432 U.S. 98, 112-13 (1977). Instead, "reliability is the linchpin in determining the admissibility of identification testimony . . . ." Id. at 114.

The courts apply a two-part test when determining the constitutionality of a pretrial identification procedure. First, courts looks at whether the procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Second, if the court finds that the identification procedure was impermissibly suggestive, exclusion is not necessarily required; instead, the court must decide whether the identification was nonetheless reliable. United States v. Givens, 767 F.2d 574, 581 (9th Cir. 1985). To determine whether the identification was sufficiently reliable, the court must look at the totality of the circumstances surrounding the identification. Neil, 409 U.S. at 199-200. It then weighs the indicia of reliability found in those circumstances against the "corrupting effect of the suggestive identification procedure itself." Brathwaite, 432 U.S. at 114; Bagley, 772 F.2d at 492.

**A. Suggestiveness**

The defendant has the burden of establishing that the identification procedure was impermissibly suggestive. See United States v. Sleet, 54 F.3d 303, 309 (7th Cir. 1995); Reese v. Fulcomer, 946 F.2d 247, 259 (3rd Cir. 1991). Only if the defendant meets this initial burden will the Court look to the totality of the circumstances to determine whether identification testimony should be admissible. Sleet, 54 F.3d at 309; Reese, 946 F.2d at 259.

An identification procedure is impermissibly suggestive when it emphasizes the focus

upon a single individual. United States v. Montgomery, 150 F.3d 983, 992 (9th Cir. 1998). The repeated showing of a picture of an individual can reinforce the image of the photograph in the mind of the viewer and thus become impermissibly suggestive. See Bagley, 772 F.2d at 493 (citing to Simmons v. United States, 390 U.S. 377, 382-83 (1968)). But, placing a defendant's picture in two separate lineups both of which are presented to an eye witness does not necessarily make that type of repetitive lineup procedure suggestive. See United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985) ("The fact that [the defendant] was the only individual common to the photo spread and the lineup cannot, without further indicia of suggestiveness, render the lineup conducive to irreparable misidentification."); Bryant v. Felker, 2011 WL 227672 (N.D. Cal. Jan. 24, 2011) (finding that the fact that the defendant was the only person to be in both photo lineups was not unduly suggestive).

In this case, Freriks's photograph was not included in two lineups. Instead, Inspector Hoffman presented the eye witnesses with a proper lineup but when the witnesses could not make an identification from the lineup, he had them view a more recent single photograph of Freriks. The Supreme Court has indicated that identifications arising from single-photograph displays should be viewed with suspicion. See Stovall v. Denno, 388 U.S. 293, 302 (1967) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."). See also Givens, 767 F.2d at ("[s]howing a witness a single photograph which potentially suggests an identification desire by law enforcement officials is improper conduct which we do not condone."). An exception may exist when that single-photograph display or some other type of "show up" is imperative or part of certain exigent circumstances. See Stovall, 388 U.S. at 301-02 (holding that a one person showup in a

11

hospital room of a critically wounded victim did not violate due process where the record revealed that the suggestive identification procedure was imperative); Brisco v. Ercole, 565 F.3d 80, 88-89 (2d Cir. 2009)("Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect.").

In this case, the presentation of Freriks's booking photograph to the two witnesses singly and apart from a photo lineup certainly emphasized the focus upon Freriks and increased the danger of misidentification. Nothing in the record suggests that this single-photograph procedure was part of an exigent circumstance. The first attempt to obtain eyewitness identifications was undertaken about three months after the crime. Furthermore, nothing in the record suggests that this single-photograph procedure was imperative. Inspector Hoffman was in a difficult position because a new photo lineup could have also unduly drawn attention to Freriks because the quality of the hard copy of the booking photograph would have stood out against any other license photographs, which were all digital. But certainly a single photo of Freriks is the epitome of focusing the witnesses' attention on Freriks. Rather than take a risk that the lineup may be suggestive of Freriks, Inspector Hoffman proceeded with a single photo presentation, which all but ensured a suggestion that Freriks was a person of special interest to police. In addition, the photo used showed Freriks with a blackened eye and the witnesses previously described the suspect as having a bruised, blackened eye.

While Inspector Hoffman did advise the witnesses that the person in the photo was not necessarily a criminal or a suspect, the single-photo procedure unduly drew their attention to one

12

person only, and to a person photographed with a blackened eye.  The use of a single photo of Freriks was suggestive.  It is difficult to imagine a more suggestive identification procedure.

**B. Reliability**

Given this Court's finding that photo was suggestive, it must look at the totality of the circumstances to see if the identifications were nonetheless reliable.  There are several circumstances the Court should consider when evaluating the reliability of the pretrial identification: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the witness' prior description of the criminal; 4) the level of certainty demonstrated by the witness at the confrontation; and 5) the length of time between the crime and the confrontation.  Neil, 409 U.S. at 199-200; Bagley, 772 F.2d at 492.

**1. Ms. Cortez**

Keeping these factors in mind, this Court first examines Ms. Cortez's identification of Freriks as the man who entered the hotel on January 15, 2008 and asked to retrieve his gun from room 105.  First, Ms. Cortez saw the man linked to room 105 on two occasions that day. She saw that man, along with another man, as they were checking out of the room.  At that time, however, the gun had not yet been found and so there was no unusual circumstance to specifically draw her attention to these two men.  Nothing on the record indicates how long she observed them or if she had a direct view of them.  She then saw the man shortly thereafter when he came back to the hotel to see if he could get back into room 105.  He came to the front desk and asked whether he could reenter room 105.  While this encounter may not have been long, it certainly was direct.  Given that he spoke to her and she answered him, this Court concludes she had a good

13

opportunity to view him the second time she saw him.

Second, this Court finds that Ms. Cortez paid attention to the man when he reentered the hotel to ask about retrieving something from room 105. At that time the housekeeper had found the gun, the police had responded to the hotel to obtain the gun, and they were worried about someone coming back to look for it. Her attention was certainly heightened.

Third, as described in the facts above, Ms. Cortez provided Inspector Hoffman with a verbal description of the man before she looked at any photographs. Her verbal description is quite accurate when compared to the booking photograph of Freriks. She stated that he was a white male about 28-years-old, that he had brown hair that was closely cropped to his head, that he was about six-feet tall and rather skinny, that he appeared to be unshaven, and that he had a bruised or healing black eye. This description matches the booking photograph of Freriks shown to Ms. Cortez on April 18, 2008. Fourth, her level of certainty was stated to be high, at 100 percent.

Finally, this Court must examine the length of time between the crime and the identification. In this case, the time elapsed was significant, about three months. However, the amount of time is not so great as to cause Ms. Cortez's April identification of Freriks to be unreliable given that the other indicia of reliability are strong.

Therefore, looking at all the circumstances related to Ms. Cortez's identification on April 18, 2008, this Court concludes that while the single-photo identification procedure was extremely suggestive, Ms. Cortez's identification of Freriks was nonetheless reliable and should be admissible during trial. The trier of fact can determine what weight to assign to the accuracy of the identification, given the three-month delay and the earlier failure to pick Freriks out of the

photo line up.

### 2. Ms. Rastopsoff

Ms. Rastopsoff, the housekeeper also identified Freriks in the booking photograph as the man who entered the hotel on January 15, 2008 and asked to retrieve something from room 105. This Court must apply the same five factors to her identification as well. First, unlike Ms. Cortez, Ms. Rastopsoff saw the man only once on January 15, 2008. She saw him when he approached the front desk to ask whether he could get into room 105. Ms. Cortez was the person who interacted with Freriks, but Ms. Rastopsoff was present at the front desk during the encounter.

Second, this Court finds that Ms. Rastopsoff paid attention to the man when he reentered the hotel to ask about retrieving something from room 105. At that time she had already found the gun, the police had responded to the hotel to obtain the gun, and the women were afraid of someone coming back to look for it. Her attention was certainly heightened.

Third, as described in the facts above, Ms. Rastopsoff provided Inspector Hoffman with a verbal description of the man before she looked at any photographs. She stated that he was a white male about 32 years old, that he had light brown hair that was in his face, that he was about 5'10" and 160 pounds, and that he had a bruised or healing black eye. Her description is not as accurate as Ms. Cortez's description. While she does note the healing black eye, her description of Freriks's hair is not accurate. His hair in the picture is closely cropped to his head and not in his face. Fourth, her level of certainty about the accuracy of the identification was stated to be at 80 percent.

Finally, this Court must examine the length of time between the crime and the

15

confrontation.  As with Ms. Cortez, the time elapsed between the identification date and January 15, 2008 was significant, about three months.

This Court finds that the reliability of Ms. Rastopsoff's identification is a closer call. Unlike Ms. Cortez, her verbal description of the suspect did not match the booking photograph shown to her.  She described someone with hair in his face.  The booking photograph, taken that same day, shows Freriks with almost a shaved head.  She did not indicate that the suspect had facial hair but the booking photograph shows a man with heavy stubble.  Her level of certainty that the man from January 15, 2008 was the same man as shown in the booking photograph, was only 80 percent.  These circumstances, when combined with the lapse of three months between the event at issue and the identification, cause this Court to conclude that Ms. Rastopsoff's identification was not so reliable as to outweigh taint of the suggestive identification procedure.

## V. CONCLUSION

Given the foregoing analysis, this Court respectfully recommends that the motion at Docket 24 be GRANTED IN PART AND DENIED IN PART and that evidence regarding Ms. Cortez's pretrial identification of Freriks and any identification of Freriks during trial by Ms. Cortez be deemed admissible but that evidence of Ms. Rastopsoff's pretrial identification of Freriks and any identification testimony from Ms. Rastopsoff during trial be suppressed.

DATED this 5th day of April, 2011, at Anchorage, Alaska.

/s/ Deborah M. Smith
DEBORAH M. SMITH
United States Magistrate Judge

Pursuant to Fed. R. Crim. P. 59(b)(2) and D.Ak.L.M.R. 6(a), a party seeking to object to this final finding and recommendation shall file written objections with the Clerk of Court no

later than **CLOSE OF BUSINESS, April 13, 2011.**  Pursuant to Fed. R. Crim. P. 59(b)(3), objections will be first considered by the District Court Judge who will then accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration.  Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-89 (9th Cir. 1980), cert. denied, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.  United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **CLOSE OF BUSINESS, April 15, 2011**  The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).  **The shortened objection and response deadlines are necessary due to the looming trial date.  D.AK. L.M.R. 6(a) authorizes the court to alter the standard objection deadlines.**